IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF BABY GIRL R.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF BABY GIRL R., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ROBIN R., APPELLANT.

Filed September 10, 2024.    No. A-24-078.

Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge.
Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Emma J. Lindemeier for appellant.

Nikolaos Piperis, Deputy Douglas County Attorney, and James T. Olsen and Jordan T.
Klein, Senior Certified Law Students, for appellee.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

ARTERBURN, Judge.

INTRODUCTION

Robin R. appeals from the order of the separate juvenile court of Douglas County, which
ordered continued placement of Robin's minor child outside of her home and found that reasonable
efforts had been made to prevent the child's removal from Robin's home. Because we find that
reasonable efforts were made and that the court did not err in ordering continued detention of the
child with placement outside of Robin's home, we affirm.

BACKGROUND

Robin gave birth to Baby Girl R. on December 21, 2023, and named her I'Mani. At the
time of the birth, Robin was 18 years old and in the custody of the Department of Health and

- 1 -

Human Services (the Department) after being removed from her family home and placed in foster care. The Department made the decision to remove I'Mani from Robin's custody in the week leading up to the birth as a result of ongoing safety concerns. The Department effectuated the removal of I'Mani from Robin's care on December 22, while the two remained at the hospital.

Also on December 22, 2023, the State filed a petition with the juvenile court alleging that I'Mani was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), due to the faults or habits of Robin. Specifically, the petition alleged that Robin was unable to put herself in a position to provide I'Mani with proper parental care, support, supervision, or safety; was unable to provide for I'Mani's daily needs; and actively engaged in domestic violence with I'Mani's putative father, Joshua B. The juvenile court entered an ex parte order for immediate temporary custody of I'Mani, requiring I'Mani to be placed outside of Robin's home. A hearing on the continued detention of I'Mani was scheduled for January 4, 2024.

At the January 4, 2024 hearing, Robin resisted continuing the Department's custody of I'Mani and requested that she be placed back in Robin's home. In support of its request to continue the detention of I'Mani, the State called Selena Leon to testify. Leon was Robin's case manager beginning in March 2023, and authored the removal affidavit for I'Mani. Leon's testimony indicated three reasons for I'Mani's removal. First, the removal was based on Robin's increasingly erratic and aggressive behavior in the months leading up to I'Mani's birth. Second, at the time of the birth, Robin did not have a safe and stable housing situation for I'Mani. Third, Robin engaged in domestic violence with Joshua and had demonstrated an inability to end this relationship for I'Mani's benefit.

In the months leading up to I'Mani's birth, Robin displayed a pattern of aggressive and erratic behavior. Leon testified that multiple foster placements reported that Robin was verbally aggressive toward her foster families, including making violent threats to physically harm them. For example, Robin's most recent foster parent reported that Robin made threats about having people harm the foster parent's niece, who was a sixth grader. Other foster parents reported that when Robin would get upset, she would threaten to have Joshua's friends or family shoot at their houses and cars. All of Robin's former foster parents reported feeling unsafe in their homes when Robin was placed there.

In addition, during the time frame beginning in March 2023 and ending in December, at the time of I'Mani's birth, Robin was placed on probation, but was unsuccessfully discharged as a result of her failure to follow the tenets of her probation order. Robin was arrested in November 2023, approximately 1 month before giving birth. Leon was unsure of the status of the criminal charges which gave rise to the arrest. Moreover, after I'Mani was removed from Robin's care and custody, Robin left the hospital against medical advice. Before she left, however, she smeared blood and feces in several locations around her hospital room.

As a result of Robin's aggressive and erratic behaviors, the Department had struggled to find a safe and stable placement for her. Between September and December 2023, Robin had seven different foster care placements, each lasting only a week or two. Robin's foster parents struggled to find effective ways of de-escalating Robin's violent and aggressive behaviors and did not feel safe having Robin in their homes as a result of her violent threats.

Shortly before I'Mani's birth in December 2023, Robin was placed in the home of her sister in an independent living situation. Leon testified that this living situation was one of the

Department's last alternatives, because of the number of placements Robin had gone through. Robin's sister was also involved with the juvenile court, as her children had been removed from her care and custody. Accordingly, it was not clear whether Robin would be able to live with I'Mani in her sister's home. In the days leading up to the detention hearing on January 4, 2024, Robin abruptly moved out of her sister's home and moved in with her brother, in another independent living situation. Leon testified that she did not have a lot of confidence that this placement would provide Robin with housing stability, given the volatility of Robin's living situation in the last few months.

During her testimony at the detention hearing, Leon expressed serious concern regarding Robin's relationship with her boyfriend, and I'Mani's putative father, Joshua. Robin and Joshua had been involved in multiple instances of domestic violence leading up to I'Mani's birth. In July 2023, the Department received a report that while Robin was at a healthcare clinic receiving medical care, a worker walked into a bathroom and observed Joshua to have his hands around Robin's neck. In October 2023, Joshua was arrested and charged with destruction of property after he threw Robin's cellular telephone to the ground during a heated argument outside of a hotel. Most recently, after I'Mani's birth, Robin and Joshua returned to the hospital to fill out paperwork for I'Mani's birth certificate. Both Robin and Joshua had to be escorted from the hospital by security officers after getting into an "escalated" argument.

Leon testified that, to her knowledge, Robin and Joshua were still involved in a romantic relationship in January 2024. In fact, Leon believed that Robin desired to stay in this relationship long-term, given that most of her arguments with her foster parents had been about her relationship with Joshua and given Robin's comments that she would rather live on a park bench with Joshua than stay in the custody of the Department. Robin told Leon that Joshua was "the only person that understood her, could comfort her, could calm her down." She did not understand why anyone would want her to stop seeing Joshua.

Leon also testified regarding the reasonable efforts provided to Robin prior to I'Mani's removal. While the Department did conduct a safety assessment of Robin's situation prior to making its decision to remove I'Mani from her care, the Department did not offer Robin the opportunity to participate in a safety plan to prevent I'Mani's removal. Leon testified that the absence of a safety plan was due to the Department's strong belief that Robin would not agree to stay away from Joshua or keep I'Mani away from Joshua, and that would be a requirement of the plan. Leon did discuss the possibility that I'Mani could be removed with Robin prior to I'Mani's birth. Leon encouraged Robin to demonstrate, prior to the birth, that she could provide I'Mani with safety and stability. Leon did strongly recommend to Robin that she take a parenting class and participate with community coaching, but Robin did not successfully complete either recommendation.

Leon testified that Robin did acquire many baby items, including clothes, diapers, and other necessities, as a result of her employment. Robin did work on breastfeeding I'Mani prior to her removal.

At the close of the detention hearing, the juvenile court entered an order finding that it would be in I'Mani's best interests to remain in the temporary custody of the Department. The court went on to find that it would be contrary to I'Mani's health, safety, or welfare to be returned to the home of Robin at this time.

Robin appeals from the juvenile court's order here.

ASSIGNMENTS OF ERROR

Robin asserts that the juvenile court erred in (1) finding sufficient evidence to warrant ordering continued detention of I'Mani with placement to exclude Robin's home and (2) determining that reasonable efforts were made to maintain I'Mani in Robin's home prior to removal.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id*.

ANALYSIS

In its January 2024 order, the juvenile court found "That it is in the best interests of [I'Mani] to remain in the temporary custody of the [Department] for appropriate care, education, and maintenance, to exclude the home of [Robin], until further Order of the Court." The court also found that reasonable efforts had been made to eliminate or prevent I'Mani's removal from Robin's home. Robin appeals from the juvenile court's order, contesting both the court's finding that continued detention of I'Mani outside of her home was necessary and that reasonable efforts had been made to prevent I'Mani's removal. Upon our de novo review of the record, we affirm the January 2024 order of the court in its entirety.

Neb. Rev. Stat. § 43-254 (Cum. Supp. 2022) sets forth the requirements for continuing to withhold a juvenile from his or her parent pending adjudication, and it provides, in part, as follows:

> If a juvenile has been removed from his or her parent [without a warrant as a result of concerns for the juvenile's safety], the court may enter an order continuing detention or placement upon a written determination that continuation of the juvenile in his or her home would be contrary to the health, safety, or welfare of such juvenile and that reasonable efforts were made to preserve and reunify the family if required.

Continued detention pending adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by a preponderance of the evidence at an adversarial hearing that such detention is necessary for the welfare of the juvenile. *In re Interest of Damien S.*, 19 Neb. App. 917, 815 N.W.2d 648 (2012). A detention hearing is a parent's opportunity to be heard on the need for removal and the satisfaction of the State's obligations. *Id*.

*Continued Detention.*

In her brief on appeal, Robin asserts that there was insufficient evidence presented by the State to support the juvenile court's determination that continued detention of I'Mani was necessary. Specifically, Robin alleges that the evidence presented at the detention hearing revealed that she was ready, willing, and able to care for I'Mani. She further alleges that the State failed to

demonstrate a link between Robin's unstable housing situation and the incidents of domestic violence between Robin and Joshua and any risk of harm to I'Mani.

Contrary to Robin's arguments on appeal, our review of the record from the January 2024 detention hearing reveals that the State presented sufficient evidence to demonstrate that placement of I'Mani in Robin's home would be contrary to her health, safety, and welfare. Such evidence includes reports of Robin's erratic and aggressive behaviors in the months leading up to I'Mani's birth. She threatened physical violence on multiple foster parents and their families. She was arrested and unsuccessfully discharged from a probationary order. And, after giving birth, she smeared blood and feces around her hospital room. Such actions do not demonstrate that Robin was in a position to provide I'Mani with safety and stability.

Moreover, Robin's erratic and aggressive actions resulted in her inability to sustain a safe and stable living environment. She was placed in seven different foster homes in the 3 months leading up to I'Mani's birth. Such placements lasted only 1 or 2 weeks before the Department was asked to move Robin elsewhere. A few days before I'Mani's birth, Robin was permitted to enter an independent living arrangement with her sister. While such arrangement appears to be what Robin wanted, such living situation lasted only a few weeks before Robin abruptly moved in with her brother. We share Leon's concerns that, given Robin's history, this latest living arrangement will also not last for an extended period of time. And, without a stable living environment, we question Robin's ability to effectively care for a newborn.

Perhaps most detrimental to Robin's ability to provide I'Mani with safety and stability is Robin's ongoing relationship with Joshua. Such relationship has resulted in Robin being physically assaulted while pregnant and engaging in multiple serious arguments which required intervention by law enforcement or security officers. When confronted with the problems with this relationship, Robin has refused to stay away from Joshua and has demonstrated a lack of any understanding about why the relationship is toxic. Given Robin and Joshua's ongoing relationship, if Robin was to have custody of I'Mani, there exists a very real risk of harm.

We note that at the same time that Robin was engaging in erratic and aggressive behaviors, and moving from foster home to foster home, she was informed that I'Mani's removal from her custody and care was possible if she could not demonstrate safety and stability in her lifestyle. Essentially, Robin knew that she needed to make changes in her life in order to be able to parent I'Mani, but she chose not to do so. Being prepared to parent a newborn requires more than clothing and diapers, it requires an ability and a desire to keep the child safe and to provide her with a stable lifestyle. The evidence presented at the detention hearing established by a preponderance of the evidence that custody and placement of I'Mani outside of Robin's home is necessary for the welfare of the juvenile.

*Reasonable Efforts.*

In its order, the juvenile court found that the State had provided Robin with reasonable efforts prior to I'Mani's removal, including, case management for Robin's juvenile court proceedings; various foster home placements; and independent living services. On appeal, Robin asserts that the juvenile court erred in finding the State provided sufficient reasonable efforts to justify removal of I'Mani shortly after her birth. Upon our de novo review of the record, we affirm the decision of the juvenile court that reasonable efforts were made.

The evidence presented at the detention hearing revealed that in the months leading up to I'Mani's birth, Leon spoke with Robin about the possibility that I'Mani may be removed from Robin's care. Leon encouraged Robin to take advantage of all the services being offered to her so that she could demonstrate her ability to be a safe and stable parent. In particular, Leon testified that Robin was encouraged, and in fact, court ordered, to take a parenting class, but she did not do so prior to I'Mani's birth. Robin was also offered a chance to participate in a "community coaching" opportunity, but failed to successfully complete the program. She was provided with numerous opportunities to reside in a safe and stable foster home, where she could have cared for I'Mani, but failed to behave in a way that resulted in a stable living situation. Essentially, Leon was available to help Robin prove that she was a capable parent, but Robin failed to actively engage with Leon. A safety assessment of Robin's situation was conducted just prior to I'Mani's birth, and resulted in the Department's decision to remove I'Mani.

In her brief to this court, Robin asserts that the Department should have offered her the opportunity to participate in a safety plan prior to I'Mani's removal so that she could demonstrate she was a capable parent. Leon testified that such a plan was not pursued because one of the tenets of that plan would have required Robin to stay away from Joshua and to keep I'Mani from Joshua. Robin had already demonstrated to the Department that she was unwilling to comply with such a rule. She continued her relationship with Joshua despite the detrimental impact it was having on her life. Upon our review, we agree with Leon that the implementation of a safety plan prior to removal would have been futile given Robin's insistence that Joshua be a part of her life. Moreover, Robin's interactions with Joshua presented a real risk of harm for I'Mani.

Ultimately, we conclude that the juvenile court did not abuse its discretion in ordering that the Department retain custody of I'Mani pending further juvenile court proceedings. The evidence revealed that continued detention of I'Mani is necessary for her health, safety, and welfare.

## CONCLUSION

Upon our de novo review of the record, we affirm the order of the juvenile court which granted the Department continued custody of Robin's newborn daughter, I'Mani, and provided that placement of I'Mani was to be outside of Robin's home.

AFFIRMED.